IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DENNY LEE NEWMAN, JR.,

      Plaintiff,

v.                                                    CASE NO. 5:16-cv-2-WTH-GRJ

IZUEGBU MOSES, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This case is before the Court on ECF No. 22, Defendants' Motion for Summary Judgment. Plaintiff has filed a response in opposition to the motion, ECF No. 28, and the motion is therefore ripe for review. For the following reasons, the undersigned recommends that Defendants' motion for summary judgment be granted.

## I.  INTRODUCTION

Plaintiff, a *pro se* litigant previously in the custody of the Florida Department of Corrections ("FDOC"), initiated this action under 42 U.S.C. § 1983. (ECF No. 1.)  Plaintiff alleges Defendants Moses Izuegbu, M.D. ("Dr. Izuegbu"), and Leslie Keel, RN ("Nurse Keel"), were deliberately indifferent

to Plaintiff's serious medical needs in violation of the Eighth Amendment while Plaintiff was incarcerated at Calhoun Correctional Institution ("Calhoun CI"). (*Id.*) As relief, Plaintiff seeks damages in the amount of $175,000, all relief proper, and a temporary restraining order "only if actions continue." (*Id.* at 9.)

Defendants now move for summary judgment as a matter of law. (ECF No. 22.) Defendants argue the undisputed evidence demonstrates they were not deliberately indifferent to any serious medical need. (*Id.*) Defendants have filed affidavits, (ECF Nos. 22-1, 22-3), and copies of Plaintiff's medical records, (ECF No. 22-2), in support of their motion for summary judgment.

Plaintiff has filed a response in opposition to the motion for summary judgment along with a handwritten declaration subscribed by him as true under penalty of perjury.[1] (ECF No. 28.)[2]

---

[1]Under 28 U.S.C. § 1746,

[w]herever, under any . . . rule, . . . any matter is required or permitted to be supported, evidence, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidence, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated . . . .

Plaintiff's complaint is also signed under penalty of perjury (ECF No. 1)[3] and, therefore, Plaintiff's complaint and his unsworn declaration in opposition to the motion for summary judgment are properly treated by the Court like sworn affidavits. *See Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[T]his Court has recognized that facts alleged in an inmate's sworn pleading are sufficient [to defeat a properly supported motion for summary judgment] and that a separate affidavit is not necessary.").

## II. EVIDENCE

In December 2014, Plaintiff's medical problems included hypertension (high blood pressure) and Type-II diabetes. (ECF No. 22-1 ¶ 7 ("Izuegbu Aff."); ECF No. 22-2 at 1 ("MR").) Plaintiff also had a history of coronary artery disease, for which he underwent coronary artery bypass grafting and placement of stents prior to arriving at Calhoun CI. (Izuegbu Aff. ¶ 7; MR at 2.)

---

[2] Plaintiff's handwritten response and declaration are, however, largely illegible and indecipherable.

[3] Plaintiff's handwritten complaint is also difficult to decipher.

On March 2, 2015, the medical doctor at Calhoun CI, Dr. Izuegbu,[4]

examined Plaintiff in the chronic illness clinic where Plaintiff was regularly

monitored for his hypertension and diabetes. (Izuegbu Aff. ¶¶ 2, 7; MR at

2.) At the time, Plaintiff's prescribed medications included metroprolol,[5]

lisinopril,[6] EC ASA,[7] Protonix,[8] Plavix,[9] metformin,[10] and glipizide.[11]

(Izuegbu Aff. ¶ 7; MR at 2.) Dr. Izuegbu determined Plaintiff's degree of

diabetic control was fair and his hypertension stable. (*Id.*)

On March 9, 2015, Plaintiff declared a medical emergency for

---

[4] Dr. Izuegbu is employed by Centurion of Florida ("Centurion") as a medical doctor at Calhoun CI. (Izuegbu Aff. ¶ 2.) Dr. Izuegbu has examined, diagnosed, and treated numerous patients with chest pain and stroke symptoms and is familiar with the standard of care for treating both conditions. (*Id.* ¶ 5.) Dr. Izuegbu's opinions are rendered within a reasonable degree of medical certainty. (*Id.* ¶ 3.)

[5] Metroprolol is a beta-blocker used to treat high blood pressure, chest pain, and heart failure. (Izuegbu Aff. ¶ 9.)

[6] Lisinopril is an ACE inhibitor used to treat high blood pressure and heart failure. (*Id.*)

[7] EC ASA is enteric coated aspirin, which is used to prevent blood clots, thereby reducing the risk of stroke and heart attack. (*Id.*)

[8] Protonix is a proton-pump inhibitor used to treat gastroesophageal reflux disease and esophagitis. (*Id.*)

[9] Plavix is a blood thinner used to prevent blood clots, thereby preventing stroke, heart attack, and other heart problems. (*Id.*)

[10] Metformin is used to treat Type-II diabetes. (*Id.*)

[11] Glipizide is used to treat Type-II diabetes. (*Id.*)

complaints of chest pain radiating to his left arm. (Izuegbu Aff. ¶ 10; MR at 3–4.) His blood pressure was elevated at 177/101. (*Id.*) After the nurse performed an EKG and provided Plaintiff with three nitroglycerin ("nitro") tabs and Maalox, Dr. Izuegbu ordered that Plaintiff be sent to the hospital because his condition remained unchanged after receiving the nitro and Maalox. (*Id.*)

> Nitro is a nitrate that works by widening the blood vessels to allow blood to flow more easily. It is used for treating high blood pressure during surgery, controlling congestive heart failure associated with heart attack, and treating chest pain. It can prevent or relieve a sudden attack of angina (chest pain).

(Izuegbu Aff. ¶ 11.)

When Plaintiff returned from the hospital on March 10. 2015, he was placed in the infirmary for observation and to continue his medications. (*Id.* ¶ 12; MR at 6–7.) Plaintiff was discharged from the infirmary on March 11, 2015, after reporting he no longer had chest pain. (Izuegbu Aff. ¶ 12; MR at 8.)

Plaintiff avers that he always takes his medications. (ECF No. 28-1 at 6 ("Pl. Aff.").) According to Plaintiff's medical records, however, on March 30, 2015, Plaintiff refused his Coreg,[12] lisinopril, and metformin. (Izuegbu

---

[12] Coreg is used to treat high blood pressure and heart failure. (Keel Aff. ¶ 6.)

Aff. ¶ 14; MR at 18–19.) On March 31, 2015, Plaintiff refused vitals and all medications. (Izuegbu Aff. ¶ 14; MR at 20–26.) Plaintiff was thereafter counseled on April 1, 2015, about the importance of taking his medications. (Izuegbu Aff. ¶ 14; MR at 27.) Nevertheless, Plaintiff again refused vitals and all medications. (Izuegbu Aff. ¶ 14; MR at 28–31.) Plaintiff continued to refuse his medications on April 2, 2015, and April 3, 2015. (Izuegbu Aff. ¶ 14; MR at 31–35.)

Dr. Izuegbu examined Plaintiff in the chronic illness clinic on June 8, 2015. (Izuegbu Aff. ¶ 17; MR at 40.) Plaintiff denied chest pain, palpitations, shortness of breath, abdominal pain, nausea, or vomiting. (*Id.*) Dr. Izuegbu assessed Plaintiff's degree of diabetic control as suboptimal. (*Id.*) Plaintiff's hypertension was also poorly controlled due to noncompliance with treatment. (*Id.*) Dr. Izuegbu, therefore, ordered blood pressure checks twice a day for four days, continued Plaintiff's medications, and ordered labs. (*Id.*)

Plaintiff declared another medical emergency on July 4, 2015, for complaints of chest pain. (Izuegbu Aff. ¶ 18; MR at 41.) His blood pressure

was 198/125. (*Id.*) Nurse Keel[13] provided three nitro tabs and Plaintiff reported having taken an aspirin in the dorm so she did not provide more aspirin. (*Id.*) She also performed an EKG. (*Id.*) Plaintiff was admitted into the infirmary for observation and his blood pressure eventually lowered to 156/90 (*Id.*) Plaintiff, however, complained of a headache. (*Id.*) Plaintiff was given Tylenol and discharged from the infirmary. (*Id.*)

On July 16, 2015, Plaintiff failed to show up for his sick call appointment and signed a refusal. (Izuegbu Aff. ¶ 19; MR at 45–46.)

A blood pressure check on August 15, 2015, revealed Plaintiff's blood pressure was elevated at 162/100. (Izuegbu Aff. ¶ 20; MR at 48.) Plaintiff reported that he was out of Coreg. (*Id.*) Although Plaintiff had been prescribed a one-year prescription for Coreg on March 11, 2015, he did not submit a refill request in August 2015 or September 2015. (Izuegbu Aff. ¶ 20.) Dr. Izuegbu instructed the nurse to provide metroprolol until Coreg arrived from the pharmacy. (*Id.*; MR at 48.) Accordingly, Plaintiff received metroprolol from August 15, 2015, through August 18, 2015, when the Coreg arrived. (Izuegbu Aff. ¶ 20; MR at 49.)

---

[13] Nurse Keel is employed by Centurion as a registered nurse at Calhoun CI. (Keel Aff. ¶ 2.) Nurse Keel's opinions are rendered within a reasonable degree of nursing certainty. (*Id.* ¶ 3.)

Plaintiff returned to the chronic illness clinic on September 8, 2015. (Izuegbu Aff. ¶ 21; MR at 50.) Plaintiff denied chest pains, palpitations, and shortness of breath. (*Id.*) Although Plaintiff claimed he was compliant with his medications, Dr. Izuegbu concluded Plaintiff's hypertension was not properly controlled based on his lab results. (*Id.*) Thus, Dr. Izuegbu increased Plaintiff's lisinopril to twice per day and ordered more labs. (*Id.*)

On September 24, 2015, at approximately 1:50 a.m., Plaintiff declared a medical emergency for complaints of sharp chest pain radiating to his left arm and numbness. (ECF No. 22-3 ¶ 6 ("Keel Aff."); Izuegbu Aff. ¶ 22; MR at 51.) Plaintiff says he was also experiencing vision problems, nausea, and face drooping and that his symptoms were stroke symptoms. (ECF No. 1 at 5 ("Compl."); Pl. Aff. at 3.) At the time, Plaintiff was out of Coreg. (Keel Aff. ¶ 6; Izuegbu Aff. ¶ 22; MR at 51.) Nurse Keel and Dr. Izuegbu assert that Plaintiff was out of Coreg because he never requested a refill, which was Plaintiff's responsibility. (Keel Aff. ¶ 6; Izuegbu Aff. ¶ 22.) Plaintiff says, however, that he had been without proper medications for weeks. (Compl. at 5.)

Sharp chest pain that radiates to the left arm is a symptom of angina, or chest pain, and not of a stroke. (Keel Aff. ¶ 6.) Instead, face drooping,

sudden weakness in the face, arm, or leg on one side of the body, speech difficulty, abrupt loss of vision, strength, and coordination, dizziness, or loss of balance with nausea or vomiting are signs and symptoms of a stroke. (*Id.*; Izuegbu Aff. ¶ 22.) Nurse Keel and Dr. Izuegbu assert Plaintiff was not experiencing a stroke because he did not display these symptoms. (Keel Aff. ¶¶ 5–6; Izuegbu Aff. ¶ 22.) Nurse Keels says had Plaintiff displayed any stroke symptoms, she would have completed a stroke or neurological protocol. (Keel Aff. ¶ 6.) Instead, Nurse Keel followed the chest pain protocol. (Keel Aff. ¶ 5; Izuegbu Aff. ¶¶ 22, 32.)

Nurse Keel took Plaintiff's vital signs upon his arrival at medical. (Keel Aff. ¶ 7.) Plaintiff's blood pressure was elevated at 187/109. (Keel Aff. ¶ 7; Izuegbu Aff. ¶ 22; MR at 51.) Nurse Keel notified Dr. Izuegbu of Plaintiff's vital signs and continued following the chest pain protocol. (*Id.*) Plaintiff informed Nurse Keel that he had taken an aspirin in the dorm so she did not provide him with another aspirin. (Keel Aff. ¶¶ 5, 7; Izuegbu Aff. ¶ 23; MR at 51.) Nurse Keel did, however, provide three nitro tabs at 2:05 a.m., 2:25 a.m., and 2:35 a.m., to help alleviate Plaintiff's chest pain, which was the standard procedure for patients with chest pain. (*Id.*) Nonetheless, according to Plaintiff, he was not given nitro tabs or anything for pain relief.

(Compl. at 5.)

Nurse Keel also attempted to perform an EKG on Plaintiff. (Keel Aff. ¶¶ 5, 7; Izuegbu Aff. ¶ 23; MR at 51.) When performing an EKG, the patient is told to lie down on the medical table on their back with their palms face up. (Keel Aff. ¶ 7.) Nurse Keel stood up on a step stool to place the EKG leads on Plaintiff. (*Id.*) When Nurse Keel was up on the stool she could see Plaintiff moving his left hand close to the wall. (*Id.*) Nurse Keel educated Plaintiff on how EKGs worked and that he needed to remain completely still during the procedure. (*Id.*) Moving and talking can distort EKG results. (Izuegbu Aff. ¶ 25.) Plaintiff, however, continued to move his left hand. (Keel Aff. ¶¶ 5, 7.) Plaintiff maintains that he had not control over his left arm which was shaking. (Compl. at 5.) Consequently, Nurse Keel was unable to properly complete the EKGs to obtain reliable readings. (Keel Aff. ¶¶ 5, 7; Izuegbu Aff. ¶ 23; MR at 51.)

Nurse Keel placed Plaintiff in the infirmary for observation at 2:45 a.m. (Keel Aff. ¶ 9; Izuegbu Aff. ¶ 24; MR at 52.) By then, Plaintiff's blood pressure had lowered to 162/93, evidencing that the medication was working. (*Id.*) Nurse Keel called Dr. Izuegbu again to update him on Plaintiff's condition. (Keel Aff. ¶ 9; Izuegbu Aff. ¶ 24.) Dr. Izuegbu

instructed Nurse Keel to provide 25 milligrams of metroprolol because

Plaintiff was out of Coreg and to attempt another EKG in the morning.

(Keel Aff. ¶ 9; Izuegbu Aff. ¶¶ 6, 24; MR at 52.) There was no clinical

reason to send Plaintiff to the hospital for an EKG at that time. (Izuegbu

Aff. ¶¶ 24, 32.) Accordingly, Nurse Keel provided Plaintiff with metroprolol,

which also works to reduce chest pain by lowering blood pressure. (Keel

Aff. ¶¶ 5, 9; MR at 52.) Nurse Keel placed Plaintiff in Semi-Fowler's

position,[14] which is the standard of care for patients with chest pain. (Keel

Aff. ¶ 9; Izuegbu Aff. ¶ 23; MR at 51.) She continued to monitor Plaintiff in

the infirmary overnight. (Keel Aff. ¶ 9; MR at 51–52.)

  Nurse Keel attempted another EKG on Plaintiff in the morning on

September 25, 2015, but Plaintiff would not lay still or cease talking. (Keel

Aff. ¶ 9; Izuegbu Aff. ¶ 25; MR at 51–52.) Thus, she was unable to obtain a

reliable EKG result. (*Id.*) Plaintiff says while attempting the EKG, Nurse

Keel became hostile, grabbed Plaintiff's wrists and slammed them down.

(Compl. at 5; Pl. Aff. at 3.) Nurse Keel maintains, however, that she never

slammed Plaintiff's wrists down or held him down. (Keel Aff. ¶ 9.)

---

  [14] Semi-Fowler's position "is the position of a patient lying in bed in a supine position with the head of the bed at approximately 30 to 45 degrees." (Keel Aff. ¶ 9.) "A Semi-Fowler's position is used for patients experiencing chest pain because it reduces the oxygen requirements of the ischemic myocardium." (Izuegbu Aff. ¶ 23.)

Nonetheless, because Plaintiff's vital signs had returned to normal, there was no urgent need for an EKG any longer. (*Id.*; Izuegbu Aff. ¶ 25; MR at 51–52.)

The decision whether to send a patient to the hospital is usually made by the medical doctor. (Keel Aff. ¶ 10.) "Patients with chest pain are usually sent to the hospital if their blood pressure or other symptoms do not respond to medication." (*Id.*) Dr. Izuegbu asserts that there was no reason to send Plaintiff to the hospital because he did not have any stroke symptoms and his blood pressure responded to the medication provided. (*Id.* ¶¶ 5, 10; Izuegbu Aff. ¶¶ 24–25, 32.) Plaintiff's condition could be, and was appropriately monitored in the infirmary. (Keel Aff. ¶ 10; Izuegbu Aff. ¶¶ 6, 32.) Plaintiff says, however, that the next day his pain and vision were worse. (Compl. at 6.) He eventually had an EKG, which was "not too bad." (*Id.*) Plaintiff was nonetheless released from the infirmary. (*Id.* at 8.)

Dr. Izuegbu avers that based on his education, training, experience, recollection of his treatment of Plaintiff, Plaintiff's medical history, and a review of Plaintiff's medical records, that the care provided to Plaintiff for complaints of chest pain on September 24, 2015, and September 25, 2015, met or exceeded the standard of care exercised by like medical

professionals under similar surrounding circumstances. (Izuegbu Aff. ¶ 6.)

On October 8, 2015, Plaintiff submitted a sick call request stating that he was out of Protonix and needed antacid tabs, triamcinolone cream, hydrocortisone cream, and ibuprofen for headaches. (*Id.* ¶ 26; MR at 56.) The nurse explained to Plaintiff that because Plaintiff had high blood pressure he could not order ibuprofen. (Izuegbu Aff. ¶ 26; MR at 56–57.)[15] Accordingly, the nurse ordered naproxen for headaches and the other requested medications. (*Id.*)

Plaintiff declared another medical emergency on December 6, 2015, complaining of chest pain. (Izuegbu Aff. ¶ 28; MR at 58.) The pain did not radiate and did not increase with deep breath, arm movement, or chest palpation. (MR at 58.) Plaintiff's vitals were taken and his blood pressure was 180/90. (*Id.*) Plaintiff reported that he had not taken his medications for several days. Izuebgu Aff. ¶ 28; MR at 59.) Dr. Izuegbu instructed the nurse to provide aspirin, lisinopril, and place Plaintiff in the infirmary for observation. (*Id.*) Plaintiff was also provided Tylenol for a headache. (*Id.*)

---

[15] Ibuprofen is a non-steroidal anti-inflammatory drug that can make the body retain fluid and decrease kidney function. (Izuegbu Aff. ¶ 27.) This may cause blood pressure to rise even higher, putting greater stress on the heart and kidneys, and also raise the risk for heart attack or stroke. (*Id.*)

Plaintiff's blood pressure lowered to 148/98 and he reported that his headache was better. (*Id.*) He was discharged from the infirmary. (*Id.*)

Dr. Izuegbu followed-up with Plaintiff the next day and Plaintiff admitted noncompliance with his lisinopril and that he had not requested a refill of Plavix. (Izuegbu Aff. ¶ 28; MR at 60.) Plaintiff no longer had chest pain. (MR at 60). Dr. Izuegbu added low does hydrochlorothiazide[16] and encouraged Plaintiff to comply with his medications. (Izuegbu Aff. ¶ 28; MR at 60.) Nonetheless, three days later on December 10, 2015, Plaintiff reported that he was in a hurry that morning and did not take his medications. (Izuegbu Aff. ¶ 28; MR at 61.) Plaintiff's blood pressure was 168/73. (MR at 61.)

Dr. Izuegbu saw Plaintiff in the chronic illness clinic again on December 16, 2015. (Izuegbu Aff. ¶ 29; MR at 62.) Plaintiff denied chest pains, palpitations, or shortness of breath. (*Id.*) Based on Plaintiff's labs, Dr. Izuegbu concluded that Plaintiff's degree of diabetic control and his hypertension were suboptimal. (*Id.*) Dr. Izuegbu continued Plaintiff's medications and ordered more labs. (*Id.*)

---

[16] Hydrochlorothiazide is a medication used to treat high blood pressure. (Izuegbu Aff. ¶ 28.)

On January 17, 2016, Plaintiff declared a medical emergency for chest pain over the last two days. (Izuegbu Aff. ¶ 30; MR at 63.) The pain did not radiate, nor did it increase with deep breath, arm movement, or chest palpation. (MR at 63.) Plaintiff's vitals were taken. (*Id.*) His pulse was elevated at 150 and his blood pressure was elevated at 178/22. (Izuegbu Aff. ¶ 30; MR at 63.) Plaintiff refused an EKG and all medication. (*Id.*) His blood pressure eventually lowered to 144/90 and his pulse rate lowered to 78. (MR at 63.) Plaintiff was instructed to take his medications and was then released. (*Id.*)

On January 22, 2016, Dr. Izuegbu submitted a consultation request for Plaintiff to see an optometrist to address Plaintiff's complaints of decreased vision. (Izuegbu Aff. ¶ 26; MR at 55.) Although the appointment was scheduled, Plaintiff, eventually refused the appointment. (*Id.*)

Plaintiff was transferred to Century Correctional Institution on February 23, 2016. (Izuegbu Aff. ¶ 31; MR at 64–65.) Since the transfer Dr. Izuegbu has not had any further involvement in Plaintiff's care. (Izuegbu Aff. ¶ 31.)

## III.  STANDARD OF REVIEW

In accordance with Rule 56(a), the entry of summary judgment is

appropriate only when the Court is satisfied that "there is no genuine

dispute as to any material fact and the movant is entitled to a judgment as

a matter of law." In applying this standard, the Court must examine the

pleadings, depositions, answers to interrogatories, and admissions on file,

together with any affidavits and other evidence in the record "in the light

most favorable to the nonmoving party." *Samples on Behalf of Samples v.*

*Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988.) But, "when opposing parties

tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary

judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013)

(internal quotations and citations omitted); *see also Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat summary judgment "there

must be evidence on which the jury could reasonably find for the plaintiff")

"The nonmovant need not be given the benefit of every inference but only

of every reasonable inference." *Brown v. City of Clewiston,* 848 F.2d 1534,

1540 n.12 (11th Cir. 1988) ("The summary judgment standard requires that

we resolve all reasonable doubts in favor of the non-moving party, but it

does not require us to resolve all doubts in such a manner.").

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987.) The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005.)

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage.

*Beard v. Banks,* 548 U.S. 521, 530 (2006). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See, e.g., Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d

1275, 1279 (11th Cir. 2001.)

## IV. DISCUSSION

Plaintiff alleges Defendants disregarded his serious medical needs on September 24, 2015, and September 25, 2015, by following the chest protocol instead of the stroke protocol, failing to give him pain medications, and failing to send him to the hospital. He also says the reason he experienced stroke symptoms was because he was without proper medications for weeks prior to the incident. Plaintiff further says Dr. Izuegbu repeatedly failed to properly treat Plaintiff's conditions. He claims he suffered vision problems as a result and that Defendants placed his future health at risk.

The Eighth Amendment provides the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). An Eighth Amendment claim contains both an objective and subjective component. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Under the objective prong, a plaintiff must present evidence of an objectively serious medical need. *Adams v. Poag*, 61 F.3d

1537, 1543 (11th Cir. 1995). A plaintiff has a "serious medical need" when the condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). In either case, however, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing *Farrow*, 320 F.3d at 1243).

Under the subjective prong, a plaintiff must provide evidence that the defendant acted with deliberate indifference to that serious medical need. *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). The Eleventh Circuit has clarified that under this prong, the plaintiff must prove that the defendant: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) did so by conduct that is more than gross negligence. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013)); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Subjective knowledge of a risk of serious harm requires that the defendant actually knew of the risk of serious harm. *Goodman*, 718 F.3d at 1331–32. The prisoner must demonstrate that the defendant's response was so

inadequate as to "constitute an unnecessary and wanton infliction of pain,"
and was not "merely accidental inadequacy, negligence in diagnosis or
treatment, or even medical malpractice actionable under state law." *Taylor*,
221 F.3d at 1258. Incidents of negligence or medical malpractice, however,
do not rise to the level of a constitutional violation. *Harris v. Thigpen*, 941
F.2d 1495, 1504 (11th Cir. 1991); *Estelle*, 429 U.S. at 105–06 (neither
"inadvertent failure to provide adequate medical care" nor "negligen[ce] in
diagnosing or treating a medical condition" amounts to deliberate
indifference to a serious medical need).

Defendants admit that Plaintiff's hypertension and chest pain are
objectively serious medical needs. (ECF No. 22 at 17.) The question in this
case, therefore, is whether Defendants acted with deliberate indifference
towards those serious medical needs.

The undisputed evidence demonstrates that Defendants were not
deliberately indifferent towards Plaintiff's serious medical needs because
they did not disregard a risk of serious harm. Turning first to Plaintiff's
claim that he had been without medication for weeks prior to the chest pain
on September 24, 2015, the evidence demonstrates that the only medicine
Plaintiff did not have prior to the incident was Coreg. Notably, however,

Plaintiff was prescribed a one-year prescription for Coreg on March 11, 2015. Plaintiff does not dispute that the reason he did not have Coreg was because he never requested a refill, nor does he dispute that it was his responsibility to request the refill.

Thus, with regard to this issue, Plaintiff has failed to present evidence demonstrating a genuine dispute of material facts as to whether Defendants were deliberately indifferent to his serious medical needs by failing to provide proper medications. Instead, the undisputed evidence demonstrates that the only reason Plaintiff did not have one of his medications was because he failed to properly submit a refill request. It is axiomatic that Defendants could not be deliberately indifferent for failing to provide proper medications based on Plaintiff's own failure to submit a refill request.

Next, with respect to December 24, 2015, and December 25, 2015, Plaintiff presented to medical with sharp chest pain radiating to his left arm and numbness. The undisputed evidence shows that these symptoms are not stroke symptoms. Although Plaintiff now says he was also experiencing vision problems, nausea, and face drooping, his medical records refute these assertions. "Self-serving statements by a plaintiff do not create a

question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (court could disregard plaintiff's sworn account of high speed chase because it was "utterly discredited" by the video of the chase and therefore "blatantly contradicted by the record, so that no reasonable jury could believe it"). Plaintiff's allegation that he presented to medical on September 24, 2015, with stroke symptoms is also unsubstantiated and directly contradicted by the medical record so that no reasonable jury could believe Plaintiff's allegation.[17]

Nurse Keel properly followed the chest pain protocol. She checked Plaintiff's vitals, confirmed Plaintiff had taken an aspirin, and provided three nitro tabs for pain to reduce Plaintiff's blood pressure per chest pain protocol. Despite Plaintiff's assertion that he was not provided with any pain medications or nitro, his medical records from the incident again refute this assertion. *See Whitehead*, 403 F. App'x at 403. Nurse Keel then provided metroprolol because Plaintiff was out of Coreg and placed him in

---

[17] Notably, Plaintiff does not contend that the medical records were falsified or changed after the fact.

Semi-Fowler's position per chest pain protocol. Nurse Keel attempted an EKG according to chest pain protocol but was unsuccessful because she could not obtain a reliable reading due to Plaintiff's movement—whether voluntary or involuntary. Plaintiff was monitored in the infirmary over night. The next morning Nurse Keel attempted another EKG. Although she was unsuccessful again due to movement, the medications had successfully reduced Plaintiff's blood pressure.[18] The undisputed evidence demonstrates that Defendants properly followed the chest pain protocol and that there was no need to send Plaintiff to the hospital.[19]

Although Plaintiff claims this case is not about his desire for different treatment, that is precisely the gist of Plaintiff's claim in this case.  Where an inmate has received medical treatment, and the dispute is over the

---

[18] Although there is dispute as to whether Nurse Keel was hostile and slammed Plaintiff's wrists down on the table during the EKG, this does not create a genuine dispute of *material* fact regarding a claim for deliberate indifference to serious medical needs.

[19] Even assuming Plaintiff had presented to medical as he says with vision problems, nausea, and face drooping, there is no evidence that Plaintiff suffered any injury from being treated at the infirmary instead of the hospital. *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (a plaintiff alleging an Eighth Amendment violation must show that the injury was caused by defendant's wrongful conduct). Although Plaintiff claims his vision is now worse and that he has left sided arm and leg damage, body pain, weakness, headaches, fear, anxiety, and sleeplessness, he has wholly failed to present any objective evidence of these alleged injuries or any evidence suggesting that being treated via chest protocol in the infirmary instead of the hospital caused these injuries.

adequacy of the treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments made. *Harris*, 941 F.2d at 1507 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1305 (11th Cir. 1989)). A difference in medical opinion as to either an inmate's diagnosis or course of treatment generally does not rise to the level of cruel and unusual punishment. *Id.* at 1505. Deliberate indifference may be established where an inmate has received treatment, however, by showing that the medical care received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).

Plaintiff's desire to go to the hospital instead of receiving treatment in the infirmary amounts to nothing more than his desire for different treatment. Plaintiff received treatment in the infirmary that successfully decreased his blood pressure. *See Kruse v. Williams*, 592 F. App'x 848, 856–58 (11th Cir. 2014) (county jail nurse was not deliberately indifferent to detainee's serious medical needs where she took appropriate steps to treat the detainee at the jail instead of sending him to the hospital). No reasonable jury could find that the treatment Plaintiff received on

September 24, 2015, and September 25, 2015, was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505.

Finally, Plaintiff has failed to demonstrate that Dr. Izuegbu repeatedly failed to treat Plaintiff properly. Plaintiff's rambling narratives present nothing more than conclusory and unsubstantiated allegations pertaining to past incidents of chest pain. On the other hand, the undisputed medical records demonstrate that each time Plaintiff presented to medical with chest pain he was properly treated according to the chest pain protocol, provided medications, and monitored until he could return to the dorm. When Plaintiff's hypertension was not properly controlled because Plaintiff refused to take or was not properly taking his medications, Dr. Izuegbu increased Plaintiff's medications, ordered blood pressure checks twice a day for four days, and/or ordered more labs. When Plaintiff requested prescription refills, Dr. Izuegbu refilled those prescriptions. Moreover, on the one occasion that Plaintiff's blood pressure did not respond appropriately to medication, he was indeed sent to the hospital.

Plaintiff's unsupported and conclusory claims are insufficient to demonstrate a genuine dispute as to any material fact such that a reasonable jury could conclude Dr. Izuegbu was deliberately indifferent to

Plaintiff's serious medical needs.  Accordingly, the Court concludes that the unrefuted evidence demonstrates that neither Dr. Izuegbu nor Nurse Keel were deliberately indifferent to Plaintiff's serious medical needs. Defendants are, therefore, entitled to summary judgment as a matter of law.

## V.  CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

Defendants Dr. Moses Izuegbu and Leslie Keel's Motion for Summary Judgment, ECF No. 22, should be **GRANTED**.

**IN CHAMBERS**, at Gainesville, Florida, this 20th day of April, 2017.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**